**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SABA SHAHAMAT**, <br><br> Plaintiff, <br><br> v. <br><br> **MONMOUTH UNIVERSITY, *et al.*,** <br><br> Defendants. | Civil Action No. 22-7501 (ZNQ) (LHG) <br><br> **OPINION** |

**QURAISHI, District Judge**

     **THIS MATTER** comes before the Court upon a Motion for Preliminary Injunction filed by Plaintiff Saba Shahamat ("Plaintiff"). ("Motion", ECF No. 3.) Defendants Monmouth University (the "University"), Scott Richards ("Richards"), and Stephanie Lynch ("Lynch") (collectively, "Defendants") opposed the Motion ("Opp'n Br.", ECF No. 15), and Plaintiff replied ("Reply", ECF No. 19).

     The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will DENY Plaintiff's Motion for Preliminary Injunction.

## I.    BACKGROUND AND PROCEDURAL HISTORY

     Plaintiff initiated the instant matter by filing her Complaint on December 23, 2022. ("Compl.", ECF No. 1.) Her claims are premised on an allegation that she was discriminated against and wrongfully removed from Monmouth University's Physician Assistant ("PA")

program (the "Program"). (*Id.* ¶¶ 19–41.) On the same day she filed her Complaint, Plaintiff also filed her Motion for Preliminary Injunction. (ECF No. 3.) The Court initially dismissed without prejudice Plaintiff's Motion for Preliminary Injunction based on a procedural defect. (ECF No. 22.) Plaintiff cured this deficiency and renewed her Motion on February 10, 2023. (ECF No. 23.)

In brief terms, the Motion requests that the Court compel Defendant University to readmit Plaintiff back into the PA program during the pendency of the instant litigation. (*Id.* at 2.) Plaintiff alleges that she is a female student that suffers from attention deficit hyperactivity disorder ("ADHD") and recently attended the Monmouth University's PA graduate student program. (*Id.* at 3.) For much of the time that Plaintiff attended the University, staff had subjected her to discrimination on the basis of her disability which included "disability-based harassment, retaliation for hiring an advocate, and fabricating a pretextual justification for removing [Plaintiff] from the program."[1] (*Id.*)

When Plaintiff enrolled in the PA program, she informed the University of her disabilities in an attempt to receive suitable accommodations, called a "504 plan." (*Id.*) Contrary to the agreed-upon 504 plan, Defendants Richards and Lynch refused provide those accommodations. (*Id.* at 4.) On May 23, 2022, the University informed Plaintiff it was expelling her due to plagiarism and professional misconduct, pending the outcome of the appeal process. (*Id.*) As a part of the appeal process, the University demanded that Plaintiff write an essay confessing to the alleged offenses, and detailing how she planned to improve as a student. (*Id.*) On October 4, 2022, Plaintiff submitted her letter to the University but vehemently denied the plagiarism or professional misconduct allegations. (*Id.*) On November 1, 2022, the University informed Plaintiff that they denied her appeal and she would be permanently removed from the program. (*Id.*) Although the

---

[1] Namely, the University fabricated a plagiarism narrative that later became their grounds for dismissing her. (Motion at 3.

Student Handbook provides for a hearing for a disciplinary removal, the University refused to provide Plaintiff with any hearing before determining that her expulsion was "final and binding." (*Id.* at 5.)  As a result, Plaintiff seeks a preliminary injunction and order requiring the University to reinstate Plaintiff in the program pending the outcome of the underlying litigation.  (*Id.* at 14.)

## II.   <u>LEGAL STANDARD</u>

To obtain a preliminary injunction, the moving party must demonstrate: "(1) the reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured if relief is not granted.  Moreover, the district court also should take into account, when relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *South Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 274 F.3d 771, 777 (3d Cir. 2001).  "[A] district court—in its sound discretion—should balance those four factors so long as the party seeking the injunction meets the threshold on the first two." *Id.* (citing *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975)).  It follows that a "failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction." *See id*. at 777 (citing *In re Arthur Treacher's Franchisee Litig*., 689 F.2d 1137, 1143 (3d Cir. 1982)).  As a threshold matter, the Court therefore considers the first two prongs together.  Only when a plaintiff has sufficiently met the first two prongs, does the Court consider the third prong relating to the possibility of harm to other parties and finally, evaluate whether public interest is served by granting injunctive relief.

## III.   <u>DISCUSSION</u>

### A.   LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff has failed to show that she is likely to prevail on the merits.  In her moving brief, Plaintiff argues that she is likely to prevail on her claims given that the University denied her due

process and fundamental fairness because—contrary to their own disciplinary procedures enumerated in their own Student Code of Conduct—the University neglected to provide Plaintiff a hearing or fair process before removing her from the Program. (Moving Br. at 7, ECF No. 14-1.) "Rather than providing [Plaintiff] with a hearing and basing their decision on sufficient evidence, the University demanded that [Plaintiff] write an admission to the alleged offense." (*Id.*) "The University informed [Plaintiff] that if she did not write this admission, it would not even consider allowing her to return to school." (*Id.*) "An essay, with mandated confessional admissions to wrong-doing cannot substitute for the requisite due process owed to the plaintiff. If anything, it amounts to duress." (*Id.*)

Plaintiff also argues that she is likely to prevail on her underlying disability-discrimination claims as well. (*Id.*) Plaintiff's argument is based on the University's false promise to accommodate her for her disability, refusal to adhere to their 504 plan, and failure to conduct a direct-threat analysis.[2] (*Id.* at 8.) Lastly, she says the University targeted her after she hired a disabilities advocate to address the University's failure to accommodate her for her disability. (*Id.* at 11.) The University used Plaintiff's employment of the disabilities advocate, coupled with a concocted plagiarism story to discriminate against her and ultimately remover her from the Program. (*Id.*)

Unsurprisingly, Defendants argue that Plaintiff is not likely to succeed on the merits of her claims. (Opp'n Br. at 32.) Defendants note that although Plaintiff did "not identify on which

---

[2] Plaintiff explains that "when dismissing a student with disabilities from a program, that program must assess whether or not the student poses a direct threat to patient safety." (Moving Br. at 8.) Not only can the University not prove that Plaintiff posed a direct threat to patient safety, but the University failed to conduct a threat-analysis in the first place. (*Id.* at 9.)

specific Counts she intends to rely, they appear to be Counts 7–9 (for her due process/fundamental fairness claims) and 1–6 (for her 'underlying disability-discrimination claims')."[3]  (*Id.* at 32.)

Addressing each count in turn, Defendants argue that Plaintiff is unlikely to succeed on Counts 1–3, and 6 because "Plaintiff does not contend she can meet the[] elements" of a section 504 and NJLAD claim.  (*Id.* at 35.)  Although Plaintiff argues that she can demonstrate the University failed to conduct a direct threat analysis, Defendants are clear in explaining that "at no time does the University rely on the direct threat analysis doctrine to justify Plaintiff's dismissal from the PA Program." (*Id.*)  Rather, "the University concluded that Plaintiff failed one class for plagiarism, and earned no better than a 'C'[4] in her other class, in large part because she could not timely complete her in-class assignments simulating real world Physician Assistant work." (*Id.*)

Defendants also contend that Plaintiff is unlikely to establish a retaliation claim under the Disability Discrimination Statutes (Counts 4–6) because the University did nothing retaliatory. (*Id.* at 38.)  Instead, "Plaintiff was dismissed after failing to earn sufficient grades.  This had nothing to do with her requests for accommodations (most of which were granted)." (*Id.*)  Lastly, Plaintiff is unlikely to succeed on the merits of her claims in Counts VII-IX because the University is a private University and is not governed by the Due Process clause of the Fourteenth Amendment. (*Id.* at 40.)  The University treated Plaintiff with fundamental fairness after affording Plaintiff all rights to which she was entitled under the University's policies by allowing her to appeal her grade and her dismissal from the program. (*Id.*  at 41–42.)  After carefully considering

---

[3] Plaintiff has alleged the following counts: Discrimination under the Americans with Disability Act ("ADA") – denied the benefits of educational services by reason of disability (Count I), ADA – failure to comply with the Act's direct threat analysis (Count II), Discrimination under § 504 of the rehabilitation act (Count III), Retaliation under the ADA (Count IV), Retaliation under § 504 of the rehabilitation act (Count V), New Jersey Law Against Discrimination ("NJLAD") (Count VI), Breach of contract (Count VII), Common law due process/fundamental fairness (Count VIII), and Unjust enrichment (Count IX).
[4] Per the program's rules, students must earn grades better than a "C" to pass each course.  (Moving Br. at 1.)

each appeal, the University denied Plaintiff's letter grade appeal and upheld her dismissal based on insufficient grades.  (*Id.*)

The Court agrees with Defendants that Plaintiff is not likely to succeed on the merits of her claims.  Although Plaintiff alleges that she was discriminated against on the basis of her ADHD, Defendants provide evidence that her dismissal was due to her underwhelming academic performance and consistent professional misconduct.  (Def. Exs. B, K, L, O, S.)  Upon enrollment, Plaintiff was afforded double time for exams and permission to record lectures to accommodate her for her disability.  (Dr. Richards Cert. ¶ 9.)  Despite having these accommodations, Plaintiff did not receive passing grades in her classes which alone warranted dismissal.  (Def. Exs. B, M.)  Plaintiff was thereafter given the opportunity to appeal her expulsion which was ultimately denied.  ("Appeal", Def. Ex. BB.)  Plaintiff claims that she did not receive due process before her expulsion, however, "it is established that 'due process' does not require notice and a hearing for a student expelled for scholastic failure."  *Brookins v. Bonnell*, 362 F. Supp. 379, 382 (E.D. Pa 1973) (citing *Connelly v. Univ. of Vermont and State Agr. Col.*, 244 F. Supp. 156 (D. Vt. 1965); *Barnard v. Inhabitants of Shelburne*, 216 Mass. 19, 102 N.E. 1095 (1913)).

Furthermore, pursuant to the certifications submitted by the Program's director, Dr. Scott Richards, and faculty member, Stephanie Lynch, PA-C, MSHS, Plaintiff exhibited unprofessional behavior such as tardiness, poor grades, failure to complete assignments, two acts of plagiarism, and unexcused absences that were all brought to her attention and memorialized in student advising/encounter forms.  ("Student Encounter Forms", Def. Exs. K, L, O, S; "Transcript", Def. Ex. M.)  The University documented its attempts to warn Plaintiff of her unacceptable behavior and its consequences of potential expulsion.  (Def. Exs. K, L, O, S.)  Specifically, faculty members

met with Plaintiff to "discuss continuing professionalism issues[5] which place[d] the student at risk for attrition" (Def. Ex. L), her failure to respond to emails and complete assignments (Def. Ex. O), the importance and seriousness the University places on the student handbook (*id.*), and her plagiarism (Def. Ex. S).  However, Plaintiff refused to change her behavior after she was cautioned.

Plaintiff's failing grades and aforementioned unprofessionalism all ran afoul of the Program's academic integrity policy enumerated in the University's PA Program student handbook (Def. Ex. B), and course syllabi (Def. Exs. T, EE) and were thus all grounds for expulsion.  The academic integrity policy specifically states:

> Here in the MS-PA program, one of our goals in educating students is to graduate healthcare providers who are not only clinically sound, providing the highest quality of care within their scope of practice, but also well-respected professionals within the medical community. Each student must demonstrate the ability to work effectively within a professional environment among various types of healthcare settings.
>
> The PA student must demonstrate sound judgment, intellectual honesty, and privacy and confidentiality standards in accordance to HIPAA protocols. Breaching professionalism, particularly when exhibiting any behavior that might pose a threat to the student or to others, may lead to dismissal from the program. PA students must be aware that even as students they are viewed - by both patients and medical providers – as part of the medical community. As such, PA students are expected to display the highest standards of professionalism. It is critical, therefore, that the development of professional behavior be assessed just as academic and clinical skills are measured.
>
> Importantly, many state licensure agencies, credentialing agencies, and facilities require the program to report professionalism issues of applicants who completed the PA program. Reporting such issues, which, again, is a requirement placed on the program, may delay licensure and credentialing and potentially cause issues securing employment. It is vital that all students understand this issue to help

---

[5] During the meeting held on April 22, 2021, Plaintiff was warned that "her course directors have determined she is not meeting required standards for professionalism resulting in negative professional evaluations in two of her courses."  (Def. Ex. L.)

ensure they maintain professionalism throughout their studies in the program.

(Def. Ex. B at 35.)  Accordingly,

> **In accepting admission to the MS-PA program, each student agrees to review and to abide by all policies and procedures of Monmouth University, the School of Nursing and Health Studies, and the MSPA program. Additionally, each student also agrees to abide by all policies and procedures outlined by individual clinical sites/organizations with which they may be assigned for clinical experiences.**

(*Id.*) (bold in original).  The Student Handbook devotes four pages to advising what constitutes professional/unprofessional behavior.  (*Id*. at 35–38.)  Of note:

**Professionalism Exhibited Through Professional Conduct**

The PA student should show respect to all other individuals (e.g., faculty, preceptors, patients, peers) by:
- Remaining attentive.
- Arriving on time and not leaving early, thereby not disturbing class or clinic by entering after a presentation or patient encounter has begun or leaving before a presentation or patient encounter have been completed.
- Observing all policies and procedures of the MU Student Handbook and Graduate Catalog, and MS-PA Program Student Handbooks.
- Observing all policies and procedures specific to SCPE sites.
- Using personal electronic communication devices, including, but not limited to cell phones, tablets and laptops, for educational purposes only during class or clinical activities.
- Demonstrating professional behavior at all times in classrooms, campus, and clinical settings.
- Obtaining consent for utilizing audio and video equipment.
- Seeking and following instructional input from faculty/preceptors.

. . .

**Professionalism and Academic Integrity, Dishonesty and Plagiarism**

The students of the Monmouth University PA program and MU community are held to the highest standards with regard to academic honesty and integrity. Violations of academic honesty and integrity

8

include intentional cheating on exams, copying the work of another student, discussion of examination questions and sharing of questions with peers, falsifying clinical data, falsifying attendance records or performance records, and plagiarism. Plagiarism includes submitting written materials without proper acknowledgment of the source; deliberate attribution to, or citation of, a source from which the referenced material was not in fact obtained; submitting data which have been altered or contrived in such a way as to be deliberately misleading. Note that it is your responsibility to educate yourself about what constitutes cheating and plagiarism up front. If you are not sure, speak with your professor about this matter before you turn in your work. Students found to be cheating, plagiarizing and/or involved in unauthorized collaboration on any assignment, paper or examination will receive a grade of 'F,' with no opportunity to resubmit for partial credit. Furthermore, such violations will not be tolerated and if a student is found to be in violation after an investigation they are subject to dismissal from the PA program and Monmouth University. Students should refer to the Monmouth University Student Handbook for guidance related to academic honesty and other relevant policies.

(*Id*. at 37–38.)   Critically, "[g]iven the dramatic importance of professionalism in the PA profession, the MS-PA program includes a professionalism component to every final course grade." (*Id*. at 38.)

Professionalism and student conduct, in addition to reviewing the professional code of conduct are reviewed in detail during the program's boot camp sessions. Given this, students are fully expected to abide by all professionalism and student conduct policies and expectations throughout the program beginning on the first day of class. The program, course directors, advisors, and faculty are not required to review issues with students prior to awarding a negative PDAT score. However, course directors may choose to do so at their discretion. As with other grading components, PDAT scores are final once submitted.

(*Id*.)  The Technical Standards of the PA Program require that "all candidates and students must be able to independently, with or without reasonable accommodation, meet [the] Program['s] specific technical standards. . . .  Failure to meet all technical standards at any time in the program may preclude participation in the program and activities, resulting in dismissal or deceleration/delay of graduation from the program." ("Diana Cert.", Def. Ex. D.)  Plaintiff

acknowledged receipt of the PA Program's Technical Standards.  *Id.*  The uncontradicted evidence presented by Defendants therefore clearly demonstrates that, despite being given accommodations for her disability, Plaintiff did not receive competent grades in her classes, exhibited an ample amount of unprofessional behavior, and was warned of the consequences of this behavior.  All of these were grounds for expulsion and stood independent of her disability.  Accordingly, Plaintiff has not shown a likelihood of success on the merits of her disability discrimination claims.

### B.    IRREPARABLE HARM

Plaintiff has also failed to show that she will suffer irreparable harm if the injunction is not granted.  Plaintiff argues that "the expulsion is final and, therefore, the harm is irreparable." (Moving Br. at 12.)  Namely, she argues that the harm is irreparable because she "is missing the benefits of her graduate education," "is not gaining the insights and knowledge that are part of this discipline," and "is not receiving the non-economic benefits that are part of one's education."[6] (*Id.*)  In addition, Plaintiff will have to disclose the grounds of her expulsion that is noted on her transcript which will ultimately preclude her from matriculating into another university.  (*Id.*)

In opposition, Defendants argue that Plaintiff has failed to carry the burden of clearly establishing a need for a preliminary injunction in this matter.  (Opp'n at 44.)  Defendants assert that Plaintiff is not irreparably harmed by being removed from the program because even if she were to succeed on this Motion, her semester has already started and she would likely have to wait for the spring 2024 semester to become reinstated.  (*Id.* at 47–48.)  Moreover, Plaintiff can apply for admission to other PA programs should she feel so inclined.  (*Id.* at 46–47.)

A moving party "has the burden of establishing a 'clear showing of immediate irreparable injury.'"  *Tracey v. Recovco Mortg. Mgmt. LLC*, 451 F. Supp. 3d 337, 344 (D.N.J. 2020) (quoting

---

[6] Plaintiff cites "learning for its own sake, improved quality of life, and the joy of learning" as the non-economic benefits of which she is deprived.  (Moving Br. at 12.)

*Louis v. Bledsoe*, 438 F. App'x 129, 131 (3d Cir. 2011)). Irreparable injury means harm "such that legal remedies are rendered inadequate." *Tilden Recreational Vehicles, Inc. v. Belair*, 786 F. App'x 335, 342 (3d Cir. 2019) (citing *Anderson v. Davila*, 125 F.3d 148, 163 (3d Cir. 1997).

Demonstrating irreparable harm is perhaps the single most important prerequisite for issuing a preliminary injunction. *Donlow v. Garfield Park Academy*, Civ. No. 09-6248, 2010 WL 1381010, at * 1 (D.N.J. April 1, 2010) (internal citations omitted). The party seeking injunctive relief must demonstrate irreparable harm by "a clear showing of immediate irreparable injury." *Id*. (quoting *Florence v. Bd. of Chosen Freeholders*, 595 F.Supp.2d 492, 514 (D.N.J. 2009)). Before a court may issue preliminary injunctive relief, it must be convinced that the injunction is "the only way of protecting the plaintiff from [the] harm" in question. *See Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc*., 306 F. App'x 727, 731 (3d Cir. 2009). "The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat" of irreparable harm. *See Adams v. Freedom Forge Corp*., 204 F.3d 475, 487 (3d Cir. 2000). This requires more than just "a possibility of a remote future injury," but rather sufficient evidence to make a "clear showing of immediate irreparable injury." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 655 (3d Cir. 1994) (quoting *Control Grp., Inc. v. Amoco Chems. Corp*., 614 F.2d 351 (3d Cir. 1980)). The risk of irreparable harm must not be speculative. *Acierno*, 40 F.3d at 655. Furthermore, a court cannot find irreparable harm where a defendant's breach can be adequately remedied by monetary damages. *Peterson v. HVM L.L.C.*, Civ. No. 14-1137, 2015 WL 3648839, at *6 (D.N.J. June 11, 2015).

The harm Plaintiff alleges, as a matter of law, is not irreparable. First and foremost, courts have regularly concluded that "an interruption in a student's education, while a 'genuine injury, is not irreparable.'" *Doe v. Princeton Univ.*, Civ. No. 20-4352, 2020 WL 2097991, at *7 (D.N.J.

May 1, 2020) (citing *Knoch v. Univ. of Pittsburgh*, 2016 WL 4570755, at *8 (W.D. Pa. Aug. 31, 2016); *Mahmood v. Nat'l Bd. Of Med. Examiners*, 2012 WL 2368462, at *5 (E.D. Pa. June 21, 2012)).  Moreover, given the Program's fast pace, especially in the transitional semester between didactic and clinical learning, re-inserting Plaintiff two months into the semester would undoubtedly set her up for failure.  Most importantly, although Plaintiff argues that she is precluded from admission into other PA programs, she has provided no evidence that she cannot enroll in another university's PA program.  Indeed, she has not even provided any evidence that she has tried.  *ADP, Inc. v. Levin*, Civ. No. 21-2187, 2022 WL 1184202, at *2 (3d Cir. 2022) (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487-88 & n.13 (3d Cir. 2000)) ("[T]he threatened harm 'must not be speculative.'").  "Additionally, the argument that Plaintiff's reputation, ability to enroll at other institutions, and ability to pursue a career would be damaged is too speculative to satisfy the irreparable harm requirement."  *Doe*, 2020 WL 2097991, at *7 (citing *Caiola v. Saddlemire*, Civ. No. 12-624, 2013 WL 1310002, at *2 (D. Conn. Mar. 27, 2013)).  Lastly, Plaintiff has not explained why, if she were to succeed on her claims, she could not be made whole by being reinstated and compensated with money damages for the period of time she was excluded from the Program.  *Peterson*, 2015 WL 3648839, at *6.

Because Plaintiff has failed to meet the two "most critical" factors, the Court need not address the final two factors.  *See Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) ("If these gateway factors are met, a court then considers the remaining two factors . . . ."); *see also Sandoz, Inc. v. United Therapeutics Corp.*, Civ. No. 19-10170, 2020 WL 697137, at *19 (D.N.J. Feb. 4, 2020) (denying preliminary injunction and declining to analyze the final two factors where plaintiff failed to satisfy the gateway factors).

IV.    **CONCLUSION**

For the reasons stated above, the Court will DENY Plaintiff's Motion for Preliminary Injunction.  An appropriate Order will follow.

Date: **March 3, 2023**

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

13